UNITED STATES *v.* CHAPLIN and another.

(*Circuit Court, D. Oregon.* August 29, 1887.)

PUBLIC LANDS—GRANT OF RIGHT OF WAY TO RAILWAY COMPANIES—MATERIALS.
The act of March 3, 1875, (18 St. 482,) grants the right of way to certain railway companies over the public lands, and authorizes any of such companies "to take" the material necessary for the construction of its road from the public lands "adjacent" to the line thereof. *Held,* (1) that the act is a license to the company "to take" the material necessary for the construction of its road without application to or consent of any officer of the land department, and that such department has no authority to make any regulations on the subject of such license. (2) If the company takes such material from the public lands not adjacent to the line of its road, or takes more than is permitted

by the statute, it is liable to the United States as a wrong-doer. (3) Any person who has a contract with the company to build its road, or any part thereof, or to furnish material therefor, is, without any special agreement to that effect, so far authorized to take the necessary material from the public land the same as said company might do. (4) If a person not in the employment of the company, and having no contract therewith, cuts timber off the lands adjacent to the line of its road, and the company acquires the same for the purpose of constructing its road, and so uses it, neither such person nor company is liable therefor as a wrong-doer. (5) The license to take material for the construction of the road includes the right to take material for the construction of station buildings, depots, machine-shops, side tracks, turnouts, and water stations, and the like. (6) Land is adjacent to the line of the road, within the purpose and intent of the act, when by reason of its proximity thereto it is directly and materially benefited by the construction thereof.

*(Syllabus by the Court.)*

Action to Recover Damages for Cutting Timber on the Public Lands.
*Lewis L. McArthur,* for the United States.
*Cyrus A. Dolph,* for defendants.

DEADY, J.  This action is brought by the United States to recover damages for cutting and removing timber from the public lands.  It is alleged in the complaint that on December 18, 1880, and on divers days between then and December 1, 1885, the defendant Daniel Chaplin unlawfully entered on sundry sections and subdivisions of sections of the public lands, being parts of townships 1, 2, and 3 N., of range 36 E., of townships 1 N. and 1 S., of range 35 E., of township 2 S., of range 36 E., and of township 2 S., of range 37 E., and situate in the counties of Umatilla and Union, Oregon, and cut therefrom 7,806,200 feet of growing timber, and made the same into saw-logs of the value of $2.50 per thousand, and removed the same to divers saw-mills on and adjacent to said lands, and there made the same into lumber of the value of $15 per thousand; that the defendant the Oregon Railway & Navigation Company, a corporation formed under the laws of Oregon, well knowing the premises, did, between the dates aforesaid, wrongfully take possession of said timber, and convert the same to its own use, to the damage of the plaintiff in the sum of $117,893.

The answer of the defendants contains a lot of verbose denials, which, in effect, admit the allegations of the complaint, except that the cutting and removal of the timber was unlawful.  It also contains a defense to the effect following:  The corporation defendant is formed, among other things, for the purpose of constructing a railway and telegraph from Umatilla, in Umatilla county, "across the Blue mountains, through the Grande Ronde valley, in a south-easterly direction, to a point on the east boundary line of the state;" that by the act of March 3, 1875, congress granted to the defendant the right to take from the public lands, adjacent to the line of its road, all timber necessary for the construction of the same; that the road of the defendant was located between Pendleton, Oregon, and the southern boundary of the state, over the townships above mentioned, between September 15, 1880, and June 20, 1881, and completed about November 25, 1884; that within one year from such location a profile map and plat of each section of 20 miles of said road

was duly filed with the secretary of the interior, and approved by him, as in said act of congress provided; that the defendant, being so entitled to take timber from the public lands adjacent to its line of road, for the construction thereof, "did contract with and employ" the defendant Chaplin to cut from said adjacent lands timber to be used for said purpose; that in pursuance of said employment Chaplin cut from said adjacent lands timber and ties necessary for the construction of said road, and which were actually used therefor, not exceeding three millions of feet, of no greater value than fifty cents per thousand; and the defendant Chaplin did not cut or remove from the public lands of the United States, nor did the said company receive from him or convert to its own use, any such timber, otherwise than as therein stated.

In reply to the answer the plaintiff alleges: (1) On October 19, 1881, the commissioner of the general land-office, with the approval of the secretary of the interior, promulged certain rules and regulations concerning the taking of material from the public lands under the act of March 3, 1875, which are set forth, and declare that a railway company has no power to give general authority to the public to cut timber on the public lands; that individuals cutting timber on the public lands, and selling the same to a railway company at an agreed price, are not agents of the company for whom it is responsible, and will be treated as trespassers, but that individuals controlled by a railway company or the contractors for the construction of its road, and for whose acts the company are responsible, will be deemed the agents of the company. Then follows a regulation to the effect that, whenever a railway company "desires to take large quantities" of material from any particular place, its representative must make application therefor in writing to the commissioner of the general land-office, through the register and receiver of the proper district, specifying under oath the kind and probable quantity of material, the purpose for which it is desired, and the particular land from which it is to be taken. That Chaplin was not an officer or agent of the Oregon Railway & Navigation Company, but merely a person who contracted to cut and deliver to said company ties and lumber at certain rates; and that in such employment he was not in any degree controlled by said company, or any contractor thereof, or any one for whose acts it is responsible; and that neither said company nor Chaplin ever made application for leave to cut any of said timber, as required by said regulation; and (2) that of the 7,806,200 feet of lumber wrongfuly converted to its own use by the Oregon Railway & Navigation Company, as alleged in the complaint, 4,806,200 feet, of the value of $62,093, was used in the construction of platforms, depots, station-houses, freight-houses, round-houses, water-tanks, and workshops; and that no part of this latter quantity was used in the construction of the road.

To both these allegations the defendants demur, because the facts stated in either are not a sufficient reply to the defense contained in the answer.

The act of March 3, 1875, (18 St. 482,) is entitled "An act granting to railroads the right of way through the public lands of the United

States." Section 1 grants the right of way through the public lands to any railway company organized under the law of any state or territory or by congress, which shall have filed with the secretary of the interior a copy of its articles of incorporation, and proof of its organization thereunder, "to the extent of 100 feet on each side of the central line of said road." "Also the right to take from the public lands adjacent to the line of said road, material, earth, stone, and timber necessary for the construction of said road." "Also ground adjacent to such right of way for station buildings, depots, machine-shops, side tracks, turnouts, and water stations, not to exceed in amount twenty acres for each station, to the extent of one station for each ten miles of the road." Section 4 of the act provides that any railway company desiring to receive the benefit of the act must, within 12 months after the location of any section of 20 miles of its road, on surveyed land or otherwise, within 12 months after the survey is made, "file with the register of the land-office, for the district where such land is located, a profile of its road;" which, being approved by the secretary of the interior, shall be noted on the plats of said office, and thereafter all lands over which such right of way passes shall be disposed of subject thereto; but, if any such section is not completed within five years from the location thereof, the rights hereby granted shall be so far forfeited.

And now, had the commissioner of the general land-office the power to make the regulations in question, or, in other words, to hamper and restrain the company in the assertion of its rights under the act, as therein provided? After a careful consideration of the matter, I am satisfied the regulations are altogether unauthorized. Where they coincide with the act, they are superfluous, and when they do not, or go beyond it, they are invalid. The act makes no provision for an application by a railway company to the land department for the appropriation of particular or any material for the construction of its road, or permission to use the same on the concession of any officer thereof, when in his judgment it may be proper to do so. On the contrary, the act is an outright grant or license to the company complying with section 4 thereof "to take" the material, subject only to two conditions,—that it is "adjacent" to the line of its road, and "necessary" for its construction. And, whether any particular material is so "adjacent" or "necessary," the company must determine at its peril, subject to the liability of an action for damages, if it should err therein; nor is it in the power of the land department to license or permit the use of any material on the public lands, so as to relieve the company from liability therefor in case the same is found not to be within the purview of the act. In short, the act gives the land department no power or authority in the premises. It can neither say how much or what material may be used in the construction of a road. The act is the measure of the company's rights in the premises, and when it has complied with the preliminary condition mentioned in section 4, it has the authority "to take" what, under the circumstances, may be said to belong to it, and no more.

Of course, the act does not authorize any one to take material from the

public lands except the railway company. But when we consider the nature of the license, and the condition and circumstances of the licensee, it must be conceded that congress could not have contemplated that a railway company would, in all or even many cases, select and take this material, so to speak, in person. Usually, railways are constructed either by contract for the entire work or for the several parts involved therein; as, for instance, grading, furnishing ties, laying track, building bridges, and the like. Now, whoever contracts with a company entitled to take material from the public lands under this act, to grade the bed of a road, to furnish ties for it, or to build a bridge on it, does thereby, and without any special agreement or authorization to that effect, so far become substituted, in this respect, to the rights of the company. And in my judgment, even where a person, not under contract with or in the employment of the company, cuts timber on the public lands adjacent to the line of its road, and afterwards disposes of it to the company, to be used in the construction of its road, and it is so used, neither such person nor the company are liable as wrong-doers. The company having a right to take such timber within the area where this was cut, and for the purpose to which it was ultimately applied, by receiving it from the hands of such person, adopt his act of selecting and cutting it, and make the same its own,—ratify it. Nor is there anything in the general powers conferred on the commissioner that can be construed to give him authority to prescribe rules for the taking of material, under this act, by railway companies; and particularly to confer on himself the right to determine in advance, from where and what quantity of such material may be taken and used.

Section 453 of the Revised Statutes authorizes the commissioner, under the direction of the secretary of the interior, "to perform all executive duties" respecting the public lands; as, for instance, concerning their survey and sale, and the issuing of patents; and by section 2478 thereof he is "authorized to enforce and carry into execution, by appropriate regulations," every part of title 32, "not otherwise specially provided for." But these "executive duties" must be prescribed by law before they can be performed, and there is no law prescribing any duty to be performed by the land department concerning the taking of material under the act of 1875. And the regulations which the commissioner may make, to enforce or carry into effect any part of title 32, can only be appropriate—legal and proper—when the statute to be enforced contemplates and admits of such regulation, and the matter is not otherwise specially provided for. Nor is the act of 1875 any part of said title, having been passed since the revision of the statutes; and, if it was, so far as the mere taking of material is concerned,—as to when and where it may be done and to what extent,—the statute leaves nothing to be regulated.

Doubtless the commissioner is authorized and charged with the duty of seeing that a railway company does not abuse this license by taking material from public lands not adjacent to the line of its road, or by taking more from lands that are adjacent thereto than is necessary for the

construction thereof. And in the exercise of this general supervision it may be proper and convenient for the company to take the opinion of the secretary and commissioner as to what are "adjacent" lands under certain circumstances, and what structures may properly be included in the phrase, "construction of its road." By this means unprofitable controversy and litigation between the government and the company may be avoided. But in the end the company may, if it will, exercise its own judgment, and take any material to which it may consider itself entitled, unless restrained by legal proceedings, subject only to the judgment of the court in which it may be proceeded against for an alleged trespass.

The facts set forth in the first allegation of the reply are immaterial and insufficient to avoid the defense contained in the answer. The materiality of the second allegation depends on the construction to be given to the word "railroad" as used in the second clause of section 1 of the act of 1875. The license "to take" material from the public lands is limited to what is necessary for the "construction" of the adjacent road.

Before undertaking to interpret the language of the act in this connection, it is proper to consider its general nature and purpose. And, first, the act is not a mere gratuity, but was evidently passed on the theory that it is for the interest of the grantor to promote the building of railways through the public domain. At its passage the United States was and still is the owner of millions of acres of wild and unsettled land. Congress intended to enhance the value and promote the settlement of these lands by inducing capital to build railways through them. The inducement is the right of way and the license to take material from the adjacent lands for the construction of the road. And this right of way is not confined to a mere roadway, but expressly includes ground, not exceeding 20 acres for every 10 miles of the road, for station buildings, depots, machine-shops, side tracks, turnouts, and water stations. From this it appears that, in making the grant of the right of way, congress appears to have considered all these structures as a necessary part of the road, and provided for them accordingly. In construing the license to take material for the construction of the road, heed should be given to what congress, in the grant of the right of way, assumed would be included in such construction. The grant of the easement over the land for the construction of the road indicates the extent of the license to take material for its construction. The one is the complement or measure of the other. The license "to take" material is manifestly intended to aid the company to build and construct that for which the right of way was given, and, nothing appearing to the contrary, it ought to be construed so as to include the structures specified in the latter as well as the mere track. But I think there is no difficulty in reaching the same conclusion on general principles. In common parlance, a railway consists of "the road" and "the rolling stock." The former includes everything that is immovable or affixed to the soil,—such as station-houses, round-houses, platforms, water-tanks, and machine-shops. The road cannot be operated without these, or considered constructed until they are built.

And under peculiar circumstances other structures or uses of material may be "necessary" in the construction of a road. A ferry-boat is a floating bridge, and a snow shed is a tunnel through a temporary but periodic snow-bank. The one is as much a part of the track as a stationary bridge, and the other as a tunnel through a permanent bank of earth or stone. Both may be necessary in the construction of a road, and without which it could not be successfully operated. Under any circumstances, it would be a narrow construction of such a license to limit it to the material necessary for the construction of the mere track; but when we consider how much the construction of this road has benefited the United States, that it has opened the country through which it passes to settlement, and greatly enhanced the value of the adjacent lands, such construction savors of downright meanness.

This material appears to have been taken from certain townships through which the road runs, and no question is made but that such lands are "adjacent" to the line of the road. What is "adjacent" land, within the meaning of the statute, must depend on the circumstances of each particular case. Where the "adjacent" ends and the non-adjacent begins may be difficult to determine. On the theory that the material is taken on account of the benefit resulting to the land from the construction of the road, my impression is that the term "adjacent" ought not to be construed to include any land save such as by its proximity to the line of the road is directly and materially benefited by its construction. The demurrer is sustained.